**Harvey B. GANTT, a minor, by his father and next friend, Christopher Gantt, Plaintiff,**

v.

**The CLEMSON AGRICULTURAL COLLEGE OF SOUTH CAROLINA, a public body corporate, et al., Defendants.**

**Civ. A. No. 4101.**

United States District Court
W. D. South Carolina,
Anderson Division.

Dec. 21, 1962.

Matthew J. Perry (Jenkins & Perry) Columbia, S. C., Constance Baker Motley

(Jack Greenberg) New York City, Donald James Sampson, Willie T. Smith, Jr., Greenville, S. C., for plaintiff.

William Law Watkins (Watkins, Vandiver, Freeman & Kirven) Anderson, S. C., and P. H. McEachin, Florence, S. C., for defendants other than J. T. Anderson, and others.

Daniel R. McLeod, Atty. Gen., State of South Carolina, for defendant J. T. Anderson, Superintendent of Education of The State of South Carolina.

WYCHE, District Judge.

This is an action by plaintiff, a nineteen year old negro resident of Charleston, South Carolina, against defendants, seeking a permanent injunction enjoining the defendants from denying him admission to The Clemson Agricultural College of South Carolina solely on account of his race.

The suit was commenced on July 7, 1962. On the same date the plaintiff filed a motion for preliminary injunction. The motion for preliminary injunction was heard on August 22, 1962, and denied on September 6, 1962. Gantt v. Clemson Agricultural College of South Carolina, 208 F.Supp. 416 (D.C.1962).

Plaintiff appealed from such Opinion and Order denying motion for preliminary injunction. After hearing arguments on the appeal, the United States Court of Appeals for the Fourth Circuit filed the following order dated October 5, 1962: "Upon consideration of the briefs of the respective parties and the full arguments of their counsel on September 25, 1962, and October 4, 1962, on the appeal of Harvey B. Gantt from the District Court's denial of his motion for preliminary injunction to secure his immediate admission to Clemson Agricultural College;

"Assurances having been given by counsel for the College that the case can be conveniently heard on the merits in the District Court at an early date, and upon his suggestion that no injunction issue pending such an early hearing; and,

"Since the appellant is now enrolled in the current term of Iowa State University, a school of his earlier selection; and,

"In the expectation that counsel for the parties will cooperate in applying to the District Court for a prompt trial, preferably within fifteen days hereof, so that any appeal will be ready to be heard not later than the first day of the January, 1963 term of this court and finally concluded before the opening of the second semester of the College, about February 1, 1963, without obstacle to the appellant's matriculation at the beginning of that school semester, should he prevail;

"It is hereby ordered by the United States Court of Appeals for the Fourth Circuit that decision on the motion for preliminary injunction be withheld for the present."

In compliance with this Order of the United States Court of Appeals for the Fourth Circuit, attorneys for both plaintiff and the defendants requested an early trial, and on October 12, 1962, attorneys for the plaintiff filed a formal motion for a trial of the case on the merits.

This motion and plaintiff's pending motion to inspect all applications for admission to Clemson College for the years 1961–1962, were heard by me on October 17, 1962, at the hearing of which motions attorneys for the plaintiff stated that they would like three weeks within which to inspect such applications for admission to Clemson College. Also, on October 10, 1962, when I received a copy of the Order of the United States Court of Appeals, the rosters of cases for the October terms of court had already been fixed and attorneys for the parties had been notified accordingly. This case could not, therefore, have been tried within fifteen days from the date of the Order of the Court of Appeals.

In order to provide an early trial of this case I advanced it on the docket ahead of all civil cases at the Anderson term of court, convening on November

19, 1962, in which division the above case was filed and was pending, and set it for trial on the merits on Monday, November 19, 1962, at three o'clock p. m.

The case was tried before me on the merits at Anderson, South Carolina, on November 19, 20, 21, 1962, at the conclusion of which attorneys for the parties agreed to waive oral arguments and to submit written briefs within five days after the receipt of the transcript of record.

At the outset of the trial plaintiff asked me to take judicial notice of certain statutes and Acts of the State of South Carolina.[1]

██ These statutes indicate a legislative policy on the part of the State of South Carolina not to prohibit but to discourage integration of the races in its State-supported colleges. It does not follow, however, that a State college must admit a member of the negro race because he is a negro. See, Briggs v. Elliott, D.C., 132 F.Supp. 776 (1955). A negro cannot be denied admission because he is a member of the negro race nor can a white person be denied admission because he is a member of the white race. So, the question for decision in this case is, has the plaintiff been denied admission to Clemson College solely because he is a member of the negro race?

Prior to the decision in 1954 by the United States Supreme Court in the case of Brown v. Board of Education, 347 U. S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the State of South Carolina provided for the education of its citizens upon a policy of racial segregation based on the belief and conviction that such a policy was not only legal but wise and would provide a better education for the boys and girls of both races. After that decision the people of South Carolina and the Legislature were confronted with the problem of adjusting to a new way of life in the field of education.

In 1955, the Legislature of South Carolina, passed Acts which provide as follows: "§ 21–2. Transfer of pupil by court order to void appropriations. Appropriations of State aid for teachers' salaries, and all other school district, county and State appropriations for the operation of the public school system, shall cease and become inoperative for any school from which, and for any school to which, any pupil may transfer pursuant to, or in consequence of, an order of any court, for the time that the pupil shall attend a school other than the school to which he was assigned before the issuance of such court order."

"§ 22–3. Court order requiring admittance of pupil automatically close institution involved. All appropriations for colleges and institutions of higher learning being made on the basis of racial segregation, the boards of trustees or other governing bodies of the University of South Carolina, The Citadel, The Clemson Agricultural College of South Carolina, Winthrop College, State Medical College, and South Carolina State College are each hereby directed to close its said institution upon any pupil being ordered admitted immediately to it by the order of any court, and to keep

[1]. Act Number 860, Acts and Joint Resolutions of South Carolina, for 1948, establishing the South Carolina Regional Education Board; Section 22–201, Code of Laws of South Carolina, for 1952; Section 22–202, Code of Laws of South Carolina, for 1952; Section 22–3, Code of Laws of South Carolina, for 1952; Section 22–3.1, Code of Laws of South Carolina, 1952; Act 927, Acts and Joint Resolutions of South Carolina, for 1956, entitled "An Act to Provide for a Committee to Study and Report on the Advisable Course to be Pursued by the State in Respect to Its Educational and Public Facilities in View of the Nullification by the Federal Courts of the State Constitution Requiring the Establishment of Separate Schools for Children of the White and Colored Races"; Act Number 749, Acts and Joint Resolutions of South Carolina, for 1962, with particular reference to Section 67 of that Act, found on page 1846; all similar items in the appropriations of South Carolina for 1960–1961, 1960, 1959, and back to the inception of the two committees mentioned, the South Carolina School Committee and the South Carolina Regional Education Board.

it closed while the pupil presents himself for admittance or until the court order is revoked."

"§ 22–3.1. Same; consequential closing of South Carolina State College. If any one of the State supported institutions of higher learning designated in § 22–3, other than the South Carolina State College, shall be forced to close as the result of a pupil being admitted by any court order, the South Carolina State College shall likewise be closed until such time as the other institution is opened."

These Acts of the Legislature do not make it unlawful for the Board of Trustees or the administration of any college to admit a negro student. The statutes are directed against the admission by order of court. If the administration or the Board of Trustees should admit voluntarily any negro, including the plaintiff, as a student at Clemson College, it would be lawful and would not be contrary to any law of the State of South Carolina. It would not require the closing of Clemson College or any other State-supported college.

In addition to the statutes above set forth, the Legislature passed an Act which provides for certain scholarships. One of the Rules and Regulations of the South Carolina Regional Education Board provides in reference to scholarships and for study at out-of-state institutions, as follows: "Scholarships may be granted to study courses which are not offered at South Carolina State College in Orangeburg, but which are offered at state-supported institutions within the State of South Carolina which are not available to Negro students."

The plaintiff in this case took advantage of this law providing money for scholarships and applied to the State Regional Board of Education for funds with which to attend Iowa State University at Ames, Iowa. It is true that this Rule promulgated by the Board

mentions race, but it was evidently passed for the purpose of encouraging a member of the negro race voluntarily to go to a college outside of the State instead of entering a college in South Carolina where only white students were attending. It does not and could not legally under the federal decisions make it unlawful for him to attend any State-supported institution in South Carolina, provided he met the entrance requirements.

■ The Legislature of South Carolina is in favor of a policy of segregated schools as far as it may do so in conformity with the law as it now exists. There is no statute now in existence which makes it illegal for the Board of Trustees or its administrative officers to admit the plaintiff as a student at Clemson College but the Acts of the Legislature indicate a policy seeking to discourage the mixing of the races in the colleges in South Carolina. If the plaintiff, or any other negro, should file an application and meet the requirements for admission, he could not legally be denied admission because of his race, and in such case it would be the duty of this court to order his admission.

With this in mind, I come now to the real issue involved in this case: Has the plaintiff been denied admission to Clemson College, and if he has been, was he denied admission solely because he is a member of the negro race?

■ The plaintiff filed an application card with Clemson College in January, 1961, indicating an interest in enrolling in architecture at Clemson College for the semester beginning in September, 1961. Though he had been furnished a copy of the college catalog and had been advised, "Please note carefully the entrance requirements as listed in the catalog" he did not attempt to file the required basic information until about August 30, 1961.[2] The only information

---

2. Clemson College had the legal right to prescribe and enforce reasonable rules and regulations in which there is no racial discrimination for the admission of applicants to Clemson College. Carson v. Warlick, 238 F.2d 724 (C.A.4, 1956); Ward v. Regents of University System of Georgia, 191 F.Supp. 491 (N.D.Ga.,

he then furnished was the result of tests given by College Entrance Examination Board of Princeton, New Jersey. He did not furnish the information required by the College catalog. This application of the plaintiff for entrance in 1961 was cancelled on August 31, 1961, along with all applications of transfer students, including about fifty from white transfer students, because of the lack of time for consideration prior to the entrance date, and plaintiff and the others were mailed a form letter of that date so notifying them. Plaintiff understood the letter of August 31, 1961, as a cancellation and enrolled and returned to Iowa State University upon receipt of it, and continued and completed his studies there for the college year 1961–1962.[3]

On December 6, 1961, plaintiff mailed another application for admission to Clemson College. At this time he was already enrolled in Iowa State University until the end of the college year 1961–1962. This is the application in question in this controversy. I should, therefore, examine the facts from the time this application was filed until this action was commenced.

In this application in answering the question "Date you desire to enter Clemson" the answer is "January 1962". In his letter forwarding this application plaintiff said "In the event this application is not processed in time for the be-

ginning of the next semester at Clemson, please consider it an application for the next ensuing and subsequent semester or school term and that it be considered a continuing application." The plaintiff further stated in this letter, "I will cause a copy of my transcript of work to be completed during the present period at Iowa State University as soon as it is ended. I will also obtain a statement from the appropriate officials of Iowa State University concerning my eligibility to return to that institution." None of this data was received at Clemson until after June 13, 1962, after plaintiff had completed his courses at Iowa State University in 1962.

On April 28, 1962, plaintiff wrote a letter inquiring as to the status of his application.[4] In reply to this letter the Registrar of Clemson College on May 21, 1962, sent the plaintiff a catalog of Clemson College and advised him that the College "cannot act on any application until the necessary information has been submitted in full."

Upon return from Iowa State University the plaintiff visited the office of the Registrar on June 13, 1962, to make inquiry about his application. His transcript of grades and necessary data had not been received by Clemson College at that time. On June 26, 1962, plaintiff sent the following telegram to the Registrar of Clemson College: "Am in-

1957); Dixon v. Alabama State Board of Education, 186 F.Supp. 945 (M.D.Ala., 1960); Hunt v. Arnold, 172 F.Supp. 847 (N.D.Gas., 1959).

3. The fall semester was to begin at Clemson on September 8, 1961. (Tr. 168) Enrollment had increased and the burden of processing applications had increased at least in like proportion. (Tr. 169) At the end of August, it became very clear that time would not permit the processing of all pending applications from transfer students, and the decision was made to cut off transfer applications on August 31, 1961. This was a step that had been recommended by the Director of Admissions for several years. (Tr. 228) Based on this experience a cut-off date was established in advance for 1962. (Pl.Ex. 29, Tr. 190) This was applied

only to transfer applicants who, if eligible to attend Clemson, remained eligible to return to the school last attended, and about fifty applicants were notified by the form letter of August 31, 1961.

4. When this letter was written plaintiff knew that he had not furnished the transcript requested and required. He knew that Clemson College required all transfer applicants to furnish a satisfactory transcript of work at the college last attended. (Tr. 12, Pl.Ex. 29) He had been informed, "When all material required has been submitted and processed, you may, under established admission policy, be called for personal interview before final decision is made. The interview will not be scheduled until your application is otherwise complete." (Pl.Ex. 13)

formed transcript of my grades forwarded to your office June 13, 1962 request my application to Clemson be favorably considered and I be given interview immediately reply within 48 hours please". If this transcript were forwarded from Iowa State University on June 13, 1962, the day plaintiff visited Clemson College, it certainly could not have arrived until a day or more after that date.

Complying with plaintiff's request that he be given a "reply within 48 hours", the Registrar sent a telegram to the plaintiff on June 28, 1962, as follows: "Retel June 26 Transcript received Your application along with all others pending completion is being processed in manner we advised during your visit to this office on June 13 You will be advised date for interview as soon as other details relative to your application have been completed."

Within four days after the Registrar replied to plaintiff's telegram, the plaintiff's application was started on its course to be duly processed. In fact, it appears that his application was to receive some priority because of plaintiff's demanding telegram. Plaintiff's application was sent to the Dean of the School of Architecture. On July 2, 1962, six days after plaintiff's telegram, the Dean of the School of Architecture addressed the following letter to the plaintiff: "The transcript of your record at Iowa State University has been handed to the School of Architecture for analysis and evaluation. As, in every case of transfer, there is some difficulty in determining the equivalence of courses at another school with courses required for a degree in Architecture at Clemson. This problem is made more difficult by the fact that Iowa State University is on the quarter system and we must convert quarters of work into semesters of work.

"To assist us in the evaluation we must see a portfolio of your work in architectural design and drawing at Iowa State University with an indication of the duration of the exercises submitted. You may submit any other creative work you care to show. The more complete this portfolio is the better our evaluation can be.

"At the time you submit this to us, or as soon as convenient thereafter, we recommend that you come to Clemson for a conference. This conference will have to do with the standards and procedures of the School of Architecture and will not be a substitute for the pre-acceptance interview provided by college admissions policies. I will be away from the campus from time to time during the summer. Please writ or telephone for an appointment before coming."

Clemson College could not act intelligently on the application and in plaintiff's interest on his application on July 2, 1962. The Dean of the School of Architecture testified that further investigation of the application was important and necessary: (a) To assess the aptitude of the applicant for the pursuing of Architecture as a career; (b) To determine the capability and real interest of the applicant and assess his creativity; (c) To determine the proper level of placement of the applicant if he should be accepted. It would determine whether the plaintiff would likely have to go four more years to Clemson College as against three more years at Iowa State University for a degree in architecture. This should have been a matter of real concern to the plaintiff.

The college processed all of the hundreds of applications for admission to its school during the summer months and did not close the decision on applications until August 31, 1962, which gave each applicant time to make arrangements to enter the school term in the fall of 1962.

The letter from the Dean of the School of Architecture gives every indication of his desire to cooperate and assist the plaintiff in the problems involved in transferring from one school of architecture to another. Plaintiff should have been interested in the matters set forth in the Dean's letter such as the determination of equivalent courses at another school with courses required for a degree in architecture at Clemson, setting forth

why, in plaintiff's particular circumstances, such a determination would be more difficult. The Dean suggested that the plaintiff write or telephone for an appointment so that the Dean would be sure to be in his office when plaintiff appeared for the conference suggested. The Dean's letter gives every assurance that the college would consider plaintiff's application upon its merits. This letter was written in conformity with the provision in the catalog governing the admission of transfer students.

In connection with an application for transfer from another college to Clemson, the Clemson College Record, 1960–1961, and 1961–1962, provides that the applicant shall furnish "an official transcript of his record, including entrance credits", and also that "Work that has been completed in other colleges with a grade one letter grade higher than the lowest passing grade will be carefully considered and evaluated in terms of equivalent courses in the curriculum at Clemson selected by the student."

When the Dean of Architecture received plaintiff's application and transcript, it became his duty to "consider and evaluate in terms of equivalent courses in the curriculum selected" by the applicant, that is, the School of Architecture. This evaluation had to be made, regardless of whether applicant was white or negro. There was no delay on the part of the Dean of Architecture. The Dean had a right to see as a part of "an official transcript of his record" a portfolio of his work in architectural design and drawings at Iowa State University with an indication of the duration of the exercises submitted. The Dean invited plaintiff to come to Clemson for a conference and bring this material with him. He also suggested that plaintiff make the appointment by telephone, indicating clearly that he was ready to act. The college had the right and the duty to make the evaluation from a complete transcript of his record and should not be compelled to admit him or any other student, white or negro, without it.

Instead of telephoning or writing the Dean of Architecture or making any other effort to comply with the request of the administrative authorities, plaintiff, on July 7, 1962, filed a complaint against the college in which he asked this court to order his admission as a student at Clemson College. This complaint significantly was dated and verified June 30, 1962.

If such a procedure should be allowed to prevail and all applicants should be allowed to file an application for admission to the college in June, and then during the first week in July should file suit against the college demanding that the court order his admission, the school would be put in a state of chaos.

On July 13, 1962, several days after the suit had been commenced, plaintiff wrote the Dean of Architecture in reply to his letter, asking the Dean to advise him "whether, in view of my pending suit, you will wish me to comply with your letter."

At the time this action was commenced Clemson College had not refused to admit plaintiff as a student to Clemson College on account of his race or on account of any other facts charged against the college.

■ The college has the legal right to process plaintiff's application along with all others. Plaintiff's application is not the only one to be considered by a college having a student body of between four and five thousand students. No court has held that an applicant must be admitted to a college solely upon the ground of race. Colleges have the right and the duty to pass upon each application submitted on its merits.

Plaintiff's application was not only for admission to Clemson College but was for the transfer from one college to another. In permitting a student to transfer from one college to another, there are many matters to be considered by the school before accepting an application for transfer. If the plaintiff is seriously interested in securing a good education in the field of architecture he should have been glad to secure and consider the wise

ccunsel of the Dean of Architecture of a great school like Clemson College. The Dean may have been able to convince the applicant that his desire to transfer would be very detrimental to his progress, or the Dean may have advised him that it was best for him to make the transfer.

The members of the Board of Trustees and the administrative officials of Clemson College deny that they have discriminated against the plaintiff on account of his race and they assert affirmatively that his application has been consistently processed and handled in the same manner and by the same standards as all other similar applications received by the College.

The inspection of the applications for admission to Clemson College by the attorneys for plaintiff did not disclose any discrimination against the plaintiff because of his race. It involved only one case of a transfer applicant whose application was treated differently from that of the plaintiff and about fifty other white transfer applicants. This applicant was a woman and was admitted in September, 1961, as a transfer student from the University of Florida. This applicant was treated differently from the fifty white transfer applicants for admission in September, 1961, whose applications for admission were denied. The evidence shows that the college had good reason for her admission. It is not denied by the college that plaintiff's application file was kept in the record vault of the college rather than in a file cabinet and the letters to the plaintiff were written not by the Director of Admissions or by the Admissions Supervisor, but were written by their immediate superior the Registrar of Admissions. The file was kept in the vault for safe-keeping. In my opinion the administrative authorities had reason to assume difficult problems might arise when the plaintiff was admitted as has happened in other parts of the country. The college authorities had to anticipate all the contingencies that might occur. This is unfortunate

but cannot be ignored. These circumstances indicate a purpose to admit him as much as a purpose to deny admission. The handling of the correspondence by the Registrar in the Department of Admissions served as an assurance that the application would be handled in all respects in accordance with existing regulations.

■ If a white person had pursued exactly the same course seeking a transfer from Iowa State University to Clemson College that the plaintiff has pursued in this case, I should not and would not enter an order to compel Clemson College to admit him.

■■ The burden is upon the plaintiff to prove the material allegations of his complaint by the greater weight of the evidence. Plaintiff's case is based upon circumstantial evidence. Plaintiff has not proved by the greater weight of the evidence that the circumstances in this case point to the conclusion that the plaintiff has been denied admission to Clemson College solely because he is a member of the negro race. The direct testimony of members of the Board of Trustees of Clemson College, the President and Admission Officers of Clemson College, testified under oath that plaintiff has not been denied admission because of his race. I cannot assume that these officers of Clemson College, whom I know to be honorable citizens of this State, would testify falsely to prevent plaintiff's admission to Clemson College.

Under the evidence and circumstances in this case plaintiff has failed to prove the material allegations of his complaint by the greater weight of the evidence; he has failed to comply with the rules and regulations for admission to Clemson College; he has failed to complete his application; he has not been denied admission to Clemson College on any ground; he has not been denied admission to Clemson College on account of his race. The plaintiff, therefore, is not entitled to the injunctive relief he seeks in this action. The complaint in this action should be, therefore, dismissed with costs

and judgment entered for the defendants.

Having reached this conclusion it is not necessary for me to determine any other question that may be involved in this controversy.

It is, therefore, Ordered, That the complaint be dismissed with costs and judgment entered for the defendants.